1

2

3                           UNITED STATES DISTRICT COURT

4                          NORTHERN DISTRICT OF CALIFORNIA

5

6

7   PABLO MORA,
                                                  No. C 12-1623 PJH
8                        Petitioner,
                                                  **ORDER DENYING PETITION
9        v.                                       FOR WRIT OF HABEAS
                                                  CORPUS; GRANTING
10   GREG LEWIS, Warden,                          CERTIFICATE OF
                                                  APPEALABILITY**
11                       Respondent.
                                          /
12

13          Petitioner Pablo Mora, a California prisoner currently incarcerated at Pelican Bay

14   State Prison, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

15   The briefs are fully submitted and court determines that the matter is suitable for decision

16   without oral argument.  Having reviewed the parties' papers and the record, and having

17   carefully considered the relevant legal authorities, the court DENIES the petition.

18                                      **BACKGROUND**

19   **A.    Factual Summary**

20          Following a jury trial in Monterey County Superior Court, petitioner was convicted of

21   attempted murder and assault with a semiautomatic firearm.  The following factual

22   summary of the offense is taken from the record of state court proceedings and the order of

23   the court of appeal affirming the judgment.  Answer, Ex. 4 (*People v. Mora*, No. H034045,

24   slip op. at 2-10 (Cal. Ct. App. Oct. 18, 2010) ("slip op.")).

25          Petitioner admitted to a police detective that he shot the victim, Anthony Trujillo,

26   during an encounter outside a party.  Although petitioner and Trujillo had never met before,

27   both attended a party at a mobile home located in Greenfield, California.  Both men had

28   been drinking.  A little after midnight on July 21, 2007, Trujillo went to the back porch for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   some air, where he encountered petitioner and another man.  Petitioner asked Trujillo

2   where he was from.  Trujillo thought it was a gang related question because he was in

3   Greenfield and he was aware of problems between Greenfield and Soledad.  Trujillo

4   responded he was from Soledad, California.  Petitioner said "fuck Chole" (slang for

5   Soledad), and pushed Trujillo.  Trujillo punched petitioner in the eye and petitioner fell back.

6   The other man who was with petitioner then punched Trujillo on the side of the head, and

7   they exchanged blows.  After Trujillo pushed that man out of the way, petitioner got up and

8   grabbed Trujillo's left leg, causing Trujillo to fall to the ground.  Petitioner then pulled out a

9   pistol and shot Trujillo three times as he was trying to get up.  At some point during the

10  incident, petitioner said "Grinfas," which is a gang term for Greenfield.  Petitioner and the

11  other man fled the scene immediately thereafter.

12       Trujillo survived the gunshot wounds.  One bullet entered Trujillo's right upper arm,

13  exited the inner upper arm in the biceps area, and then lodged in his lower right abdomen.

14  Another bullet struck the top of his left ear in a downward angle, traveled beneath the skin

15  along the jaw line, penetrated mid-sternum, traveled just underneath the skin, and ended

16  up in the lower abdomen.  A third bullet struck Trujillo on his left flank, penetrated some

17  tissue and traveled around but missed his vital organs.

18       Monterey County Sheriff's deputies responded to a call regarding "shots fired"

19  received at about 1:30 a.m. on July 21, 2007.  The deputies found Trujillo, who was

20  wounded, bleeding heavily, and very incoherent, on a bench near the back porch with a

21  female.  When asked what happened, Trujillo replied that he had been stabbed.  Trujillo

22  had actually been stabbed in 2005.  Three spent .45 caliber bullet casings and two live,

23  unfired rounds were found near each other.  Nobody was in the mobile home.

24       On August 9, 2007, petitioner was in a vehicle that was pulled over by Greenfield

25  police.  Petitioner fled on foot but was apprehended.  As he was being chased by police,

26  petitioner tossed two guns, a .44 Ruger revolver and a .45 semiautomatic handgun.  A

27  comparison of the three shell casings recovered from the crime scene on July 21, 2007,

28

United States District Court

For the Northern District of California

1    determined that one of petitioner's guns, the .45 caliber semiautomatic handgun, was the

2    gun that expelled those three recovered casings.

3        After apprehension and upon questioning, petitioner admitted he was at the

4    Greenfield party where Trujillo was shot.  He eventually admitted a fight broke out but he

5    denied throwing the first punch.  He repeatedly indicated that he had been hit and knocked

6    unconscious.  His friend had picked him up.  When he woke up, he pulled out his gun and

7    shot three times at the victim, whom he did not know.  Petitioner said there was only one

8    gun used in the shooting and the gunshots came from his .45 caliber gun.

9        Petitioner repeatedly told the detective that when he woke up, he "let it go" or "let it

10   loose."  He did not know if the shooting happened because he was knocked out and did not

11   know what was going on.  He said, "That knocking me out thing is what fucked me up."  He

12   stated a number of times that he did not even know the victim.  He said, "I don't know if

13   there was my emotions, my actions, or imagine of me to be knocked out, and know getting

14   up, and not knowing."  He supposed the shooting was "about anger or something you

15   know," "just I think me getting hit."  He said he could not remember how he got hit.  After

16   the shooting, he ran home.

17       At trial, petitioner introduced evidence that he had a black eye in the days following

18   the party.  Petitioner also called to the stand Dr. Light, a clinical and rehabilitation

19   neuropsychologist, who testified regarding head injury, including blunt force injury.  Dr.

20   Light testified that a mild head injury and concussion may result in cognitive problems

21   related to memory, learning, and higher level executive function, which includes planning,

22   organization, and decision-making capacity.

23       Dr. Light conducted a neuropsychological screening evaluation of petitioner and

24   viewed the DVD recording of petitioner's police interview.  The fact that petitioner only knew

25   that he was knocked out but could not describe the blow was consistent with retrograde

26   amnesia and suggestive of a concussion.  Dr. Light opined that petitioner's statements in

27   the interview were consistent with a concussed state.  Dr. Light conceded, however, that

28   petitioner's actions after being knocked out might be consistent with rage, or could be

3

consistent with waking up to a fight and reacting without thinking.  Dr. Light also agreed that it may be very difficult to attribute symptoms and behavior to mild head injury if someone is also drunk or acting on adrenaline or emotionally responding to a traumatic event.

**B.      Jury Instructions and Closing Arguments**

At the close of evidence, the court instructed the jury on attempted murder, attempted voluntary manslaughter, and assault with a deadly weapon.  The instruction for attempted voluntary manslaughter was given as follows:

> An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion.
>
> The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if: 1. The defendant took at least one direct but ineffective step toward killing a person; 2. The defendant intended to kill that person; 3. The defendant attempted the killing because [he] was provoked; 4. The provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than judgment; and 5. The attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment.
>
> Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
>
> In order for heat of passion to reduce an attempted murder to attempted voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.
>
> It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. **In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation, knowing the same facts.**
>
> If enough time passed between the provocation and the attempted killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on this basis.

United States District Court

For the Northern District of California

4

United States District Court

For the Northern District of California

1

2

3

> The People have the burden of proving beyond a reasonable doubt that the defendant did not attempt to kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of attempted murder.

4   Answer, Ex. 7 (Reporter's Transcript ("RT")) at 1053-54 (emphasis added).

5        In closing arguments, the prosecutor made a number of statements regarding what

6   constitutes provocation and heat of passion sufficient to warrant a conviction of attempted

7   voluntary manslaughter.  For instance, the prosecutor argued, "One of the requirements . . .

8   is that there has to be adequate provocation.  You know, someone spits on you, you may

9   not like it but it is not enough to kill him for it.  It's not enough to push you to that point

10  where you completely lose it."  RT 971.  At another point, the prosecutor stated that the

11  provocation element "requires . . . that you acted under this emotional effect that made you

12  lose reason and fly into a rage, a heat of passion."  RT 972.  At still another point in closing,

13  the prosecutor argued, "[I]f a normal person knocked down like this wouldn't get so worked

14  up, just from one punch, if a normal person wouldn't, from one punch, get so enraged that

15  he would kill somebody, well then it doesn't count."  RT 973.  The prosecutor applied this

16  argument to petitioner's actions, stating, "the normal person getting punched like [petitioner

17  was] wouldn't pull out a gun when they're not even being threatened.  He wasn't being

18  threatened when he did it.  Tony Trujillo was on the ground."  RT 973-74.

19        In response, defense counsel argued that petitioner lacked intent to kill and so the

20  jury should only convict him with assault with a deadly weapon.  Defense counsel also

21  submitted, however, that if the jury found petitioner had the intent to kill, then petitioner had

22  this intent only upon a "heat of passion" that would render attempted voluntary

23  manslaughter, rather than attempted murder.  Defense counsel in closing arguments

24  countered the prosecutor's aforementioned statements regarding sufficient provocation and

25  heat of passion by reading a portion of the voluntary manslaughter instructions to the jury.

26  Before doing so, defense counsel told the jury that the prosecutor's "ad-libbing of the law in

27  that regard requires me to do this because it's wrong and confusing."  RT 998.

28

United States District Court
For the Northern District of California

1  In rebuttal, the prosecutor argued, among other things, that the defendant has "got

2  to be provoked into [a heat of passion], but also a normal person . . . would be provoked

3  into violence under the same circumstances."  RT 1022.

4  Petitioner was convicted of attempted murder and assault with a firearm.  The jury

5  found that the attempted murder was not willful, premeditated and deliberate.  The jury

6  found true the allegations that, in committing the attempted murder, petitioner personally

7  and intentionally discharged a firearm and proximately caused great bodily injury and, in

8  committing the assault, he personally used a firearm and personally inflicted great bodily

9  injury upon Trujillo.  On March 19, 2009, he was sentenced to thirty years to life in prison.

10  Answer, Ex. 1.

11  **C.    California Court of Appeal Decision**

12  Petitioner appealed.  On direct appeal, the court of appeal upheld petitioner's

13  attempted murder conviction against a number of challenges, including allegations of

14  instructional error and prosecutorial misconduct in violation of his rights to due process,

15  which are asserted in the petition for habeas relief.

16  **1.    Instruction on Provocation**

17  The state appellate court decision begins with an analysis of the instructions given

18  by the trial court on the law of attempted voluntary manslaughter:

19  The trial court instructed the jury in accordance with the
standard instruction on attempted voluntary manslaughter: "An
20  attempted killing that would otherwise be attempted murder is
reduced to attempted voluntary manslaughter if the defendant
21  attempted to kill someone because of a sudden quarrel or in the
heat of passion. . . ."  (See CALCRIM No. 603 (2009 ed.) p. 420.)
22  As to the sufficiency of the provocation, the court instructed:  "It is
not enough that the defendant simply was provoked.  The
23  defendant is not allowed to set up his own standard of conduct.
You must decide whether the defendant was provoked and whether
24  the provocation was sufficient.  *In deciding whether the provocation
was sufficient, consider whether . . . a person of average
25  disposition would have been provoked* **and how such a person
would react in the same situation**, *knowing the same facts.*"
26  (Italics added.)  (See *id.* at pp. 420-421.)

27  Appellant argues that the italicized language constituted an
incorrect and misleading definition of provocation.  He points out
28  that the standard instruction on voluntary manslaughter, as revised

6

United States District Court

For the Northern District of California

1 | in December 2008, states with regard to the sufficiency of the provocation: "It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.*" (CALCRIM No. 570 (2009 ed.) pp. 353-354, italics added.)

While the italicized wording in the voluntary manslaughter instruction may be better than the italicized wording in the attempted voluntary manslaughter instruction in the sense that it reminds jurors that they are deciding whether a person of average disposition would have reacted from passion rather than judgment, the attempted voluntary manslaughter instruction given in this case was not incorrect or misleading. The instruction given makes clear, in the context of the instruction as a whole, that the jurors must decide with regard to the sufficiency of the provocation whether the evidence is sufficient to prove that "the provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than judgment. . . ." Further, the court specifically instructed the jury to "[p]ay careful attention to all of these instruction and consider them together." Nothing in the instruction suggests that the heat of passion form of voluntary manslaughter is limited to the circumstances where a reasonable person "would react in a violent manner and attempt to kill" as claimed by defendant.

Slip op. at 11-13 (emphasis in bold added).

The court of appeal addressed petitioner's argument that the instruction setting forth the standard for attempted voluntary manslaughter was ambiguous, particularly in light of the prosecutor's misleading closing argument:

Defendant asserts that, [ ] even if the instruction was not patently incorrect, it was ambiguous and the prosecutor's argument would have led the jury to misunderstand the legal standard for provocation sufficient to support voluntary manslaughter. He points to a number of remarks made by the prosecutor during argument that state a normal person would not be provoked into killing or acting violently if punched and the prosecutor's statement indicating attempted voluntary manslaughter requires that "a normal person would be provoked into violence under the same circumstances." The prosecutor also told the jury with respect to the provocation requirement: "We're saying just a normal, every day [sic] citizen, who got punched like that, would fly into a rage or fly into whatever heightened emotional state. And that's where it fails."

In *People v. Nagera* (2006) 138 Cal. App. 4th 212, which is cited by defendant, the reviewing court concluded the defendant was not entitled to a voluntary manslaughter instruction and, consequently,

United States District Court

For the Northern District of California

did not reach his contention that the standard instruction explaining sudden quarrel or heat of passion was ambiguous. (*Id.* at pp. 215, 226.)  The appellate court in *Najera* did determine that the prosecutor had misstated the legal standard of provocation by arguing that the law required a reasonable person to have killed under the circumstances. (*Id..* at p. 223.)

Defense counsel in closing argument read the instruction regarding attempted voluntary manslaughter to the jury because, as he told the jury, the prosecutor's "ad-libbing of the law in that regard requires me to do this because it's wrong and confusing."

"When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge. [Citation.]  For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citation.]" (*People v. Mayfield* (1997) 14 Cal. 4th 668, 777.)  Even if some of the prosecutor's comments in this case misapplied or misstated the legal standard of provocation, the jury was told:  "You must follow the law as I explain it to you, even if you disagree with it.  If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  "We presume that jurors understand and follow the court's instructions. (*People v. Mickey* (1991) 54 Cal. 3d 612, 689, fn. 17 . . . .")  (*People v. Gray* (2005) 37 Cal. 4th 168, 231.)  It is not reasonably likely that the jury in this case misunderstood or misapplied the challenged instruction to mean that the heat of passion form of attempted voluntary manslaughter required that "a person of average disposition" or a normal or reasonable person would have been so provoked as to kill or act violently.

Slip op. at 13-14.

## 2.   Alleged Prosecutorial Misconduct

The court of appeal also rejected petitioner's argument that the prosecutor

committed misconduct by misstating the standard for provocation:

"Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law [citation] . . ." (*People v. Bell* (1989) 49 Cal. 3d 502, 538.)  Insofar as defendant contends that portions of the prosecutor's argument misstated the legal standard of provocation and asserts that these remarks violated his rights under the Sixth and Fourteenth Amendments, we find these claims waived. (See *People v. Kipp* (2001) 26 Cal. 4th 1100, 1130.)  "'To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' (*People v. Brown* [(2003) 31 Cal. 4th 518, 553].)  There are two exceptions to this forfeiture: (1) the objection and/or the request for admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct . . . .  A defendant claiming that one of these exceptions applies must find support for his or her claim in the

United States District Court

For the Northern District of California

record.  (*People v. Boyette* [(2002) 29 Cal. 4th 381, 432].)"  (*People v. Panah* (2005) 35 Cal. 4th 395, 462.) No exception applies here. (*Cf. People v. Najera, supra*, 138 Cal. App. 4th at p. 224.)

Defendant also asserts that the prosecutor misstated the law by arguing in closing that defendant did not act in the heat of passion if defendant "picked the fight" or "attacked first" or "started it."  He argues that the prosecutor's argument confused the laws of self-defense and heat of passion.  [Footnote omitted.]

Again, this claim of prosecutorial misconduct was not preserved for review on appeal because defense counsel did not object.  (*People v. Dykes* (2009) 46 Cal. 4th 731, 773.)  The record does not show that the failure to object and request an admonition was excused.

In any event, the prosecutor's challenged remarks regarding the initiation of provocation were not misstatements of law.  The California Supreme Court has stated: "'[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.]"  (*People v. Avila* (2009) 46 Cal. 4th 680, 705; *see People v. Verdugo* (2010) 50 Cal. 4th 263, 293.)  Appellate courts have recognized that a "claim of provocation cannot be based on events for which the defendant is culpably responsible" (*People v. Oropeza* (2007) 151 Cal. App. 4th 73, 83) and a killer who provokes a fight cannot assert provocation by the victim (*People v. Johnston* (2003) 113 Cal. App. 4th 1299, 1312-1314).  (*Cf. People v. Jackson* (1980) 28 Cal. 3d 264, 306, plur. opn. [predictable conduct by an awakening burglary victim who resists does not constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter], overruled on another ground in *People v. Cromer* (2001) 24 Cal. 4th 889, 901.)

In *People v. Johnston, supra,* 113 Cal. App. 4th 1299, an appellate court queried whether a person who provokes a fight could claim provocation.  (*Id.* at p. 1312.)  The court concluded that the answer was no, stating, "We may assume that defendant did not travel to his ex-girlfriend's residence for the purpose of committing a homicide, even though he armed himself with a knife before going there.  But it was he who instigated the fight with [her older brother] Anthony by creating a loud disturbance at the residence, cursing the mother of the victim and girlfriend and, most particularly, challenging Anthony to come out and fight.  Having done that, he cannot be heard to assert that he was provoked when Anthony took him up on the challenge.  Defendant was 'culpably responsible' for the altercation."  (*Id.* at p. 1313.)  Treatises on substantive criminal law are in accord with this analysis.  (*See* 2 Wharton's Crim. Law (15th ed.1994) § 157, p. 352 ["If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim and claim he was provoked.  Thus, a defendant is guilty of murder when he arms himself and plans to insult the victim and then kills him if the victim strikes him in resentment over the insult. [Fn. omitted.]"]; 2 LaFave, Substantive Criminal Law (2d ed. 2003) p. 496 ["[A] violent, painful blow, with fist or weapon, ordinarily will [constitute a reasonable provocation].  [Fn. omitted.]  Even in the case where the defendant kills in response to a violent blow,

United States District Court

For the Northern District of California

however, he may not have his homicide reduced to voluntary manslaughter if he himself by his own prior conduct (as by vigorously starting the fracas) was responsible for that violent blow. [Fn. omitted.]"].)

The Supreme Court in *People v. Barton* (1995) 12 Cal. 4th 186 did not hold, as asserted by defendant, that an instruction on voluntary manslaughter was appropriate even where the defendant was the aggressor in a confrontation. In *Barton*, the Supreme Court determined that the record contained substantial evidence from which the jury could reasonably find that defendant intentionally killed the victim in a sudden quarrel or heat of passion. (*Id.* at p. 202.) The court pointed to defendant's testimony that, shortly before the killing, his daughter "had come to him, extremely upset, and told him that a man (later identified as victim Sanchez) had threatened her with serious injury by trying to run her car off the road, and that he had spat on the window of her car" and evidence that "[w]hen defendant and his daughter confronted Sanchez about his conduct, Sanchez called defendant's daughter a 'bitch' and he acted as if he was 'berserk.'" (*Ibid.*) The defendant's angry confrontation with the victim ended with the fatal shooting. (*Ibid.*) It appears that in *Barton* there apparently was sufficient evidence of provoking conduct reasonably believed by the defendant to have been engaged in by the victim. (*See People v. Moye* [(2009) 47 Cal. 4th 537, 550]; *see also People v. Brooks* (1986) 185 Cal. App. 3d 687, 693-694 [provocation was sufficient where the defendant shot the man whom he had heard fatally stabbed his brother just two hours earlier].)

Under the circumstances of this case, the prosecutor could properly argue there was no legally sufficient provocation by victim Trujillo since there was evidence that defendant had started the fight.

The record does not establish that the alleged prosecutorial misconduct resulted in a denial of due process. (*See People v. Thompson* (2010) 49 Cal. 4th 79, 120; *see Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464].)

Slip op. at 14-17.

### 3.   Denial of Review

Petitioner filed a petition for review, which the Supreme Court of California denied on January 26, 2011. Answer, Ex. 5, 6.

## D.   Procedural History

Petitioner, appearing pro se, filed the instant petition for a writ of habeas corpus on March 30, 2012. The court issued an order to show cause on April 24, 2012. After the court granted a request for extension of time by which to respond to the petition, respondent filed an answer on July 23, 2012. Counsel for petitioner entered an

United States District Court

For the Northern District of California

1   appearance on August 14, 2012, and was granted an extension of time by which to file a

2   traverse to the answer.  Petitioner filed a traverse on October 22, 2012.

3                                   **ISSUE PRESENTED**

4       Petitioner asserts the following claim for federal habeas relief: violation of his due

5   process rights when the trial court gave an erroneous jury instruction on the provocation

6   element of attempted voluntary manslaughter, and in closing argument the prosecutor

7   misstated the provocation requirement.

8                                 **STANDARD OF REVIEW**

9       A district court may not grant a petition challenging a state conviction or sentence on

10   the basis of a claim that was reviewed on the merits in state court unless the state court's

11   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

12   unreasonable application of, clearly established Federal law, as determined by the

13   Supreme Court of the United States; or (2) resulted in a decision that was based on an

14   unreasonable determination of the facts in light of the evidence presented in the State court

15   proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

16   mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

17   while the second prong applies to decisions based on factual determinations, *Miller–El v.

18   Cockrell*, 537 U.S. 322, 340 (2003).  The state court decision at issue is the last state court

19   decision that addressed the merits of the petitioner's claim.  *Ylst v. Nunnemaker*, 501 U.S.

20   797, 805 (1991).

21       A state court decision is "contrary to" Supreme Court authority, that is, falls under the

22   first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

23   reached by [the Supreme] Court on a question of law or if the state court decides a case

24   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

25   *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable

26   application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

27   correctly identifies the governing legal principle from the Supreme Court's decisions but

28   "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

11

United States District Court
For the Northern District of California

1  federal court on habeas review may not issue the writ "simply because that court concludes

2  in its independent judgment that the relevant state-court decision applied clearly

3  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

4  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.  Review under

5  § 2254(d)(1) is limited to the record that was before the state court that adjudicated the

6  claim on the merits.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

7          A state court's determination that a claim lacks merit precludes federal habeas relief

8  so long as "fairminded jurists could disagree" on the correctness of the state court's

9  decision.  *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.*

10  *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

11  unreasonable requires considering the rule's specificity.  The more general the rule, the

12  more leeway courts have in reaching outcomes in case-by-case determinations."  *Id.*  "As a

13  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

14  show that the state court's ruling on the claim being presented in federal court was so

15  lacking in justification that there was an error well understood and comprehended in

16  existing law beyond any possibility for fairminded disagreement."  *Id.*

17          Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

18  determination will not be overturned on factual grounds unless objectively unreasonable in

19  light of the evidence presented in the state-court proceeding."  *Miller–El*, 537 U.S. at 340.

20                                             **DISCUSSION**

21  **A.     Legal Standard**

22          A challenge to a jury instruction solely as an error under state law does not state a

23  claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S.

24  62, 71-72 (1991).  "Federal habeas courts therefore do not grant relief, as might a state

25  appellate court, simply because the instruction may have been deficient in comparison to

26  the CALJIC model."  *Id.* at 72.  To obtain federal collateral relief for errors in the jury

27  charge, a petitioner must show that the ailing instruction by itself so infected the entire trial

28  that the resulting conviction violates due process.  *Id.  See Waddington v. Sarausad*, 555

12

United States District Court

For the Northern District of California

1  U.S. 179, 190-91 (2009).  The petitioner must show both that the instruction was

2  ambiguous and that there was "a reasonable likelihood" that the jury applied the instruction

3  in a way that violates the Constitution, such as relieving the state of its burden of proving

4  every element of the crime beyond a reasonable doubt.  *Sarausad*, 555 U.S. at 190-91

5  (quoting *Estelle*, 502 U.S. at 72) (internal citation omitted)  "In making this determination,

6  the jury instruction 'may not be judged in artificial isolation,' but must be considered in the

7  context of the instructions as a whole and the trial record."  *Id.* at 191 (quoting *Estelle*, 502

8  U.S. at 72).  *See Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no

9  reasonable likelihood that jury was misled by single contrary instruction on imperfect

10  self-defense defining "imminent peril" where three other instructions correctly stated the

11  law).

12      A determination that there is a reasonable likelihood that the jury has applied the

13  challenged instruction in a way that violates the Constitution establishes only that an error

14  has occurred.  *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found,

15  the court also must determine that the error had a substantial and injurious effect or

16  influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637

17  (1993), before granting relief in habeas proceedings.  *See Calderon*, 525 U.S. at 146-47.

18  **B.    Analysis**

19      **1.    Ambiguous Instruction**

20      Petitioner contends that the state court decision, that his due process rights were not

21  violated, was an unreasonable application of clearly established federal law and an

22  unreasonable determination of the facts.  Petitioner argues that the instruction on voluntary

23  manslaughter was misleading as to the test for provocation because it instructed the jury to

24  consider whether an average person would have reacted the same way as petitioner, that

25  is, by pulling out a gun and shooting at close range.  "In deciding whether the provocation

26  was sufficient, consider whether a person of average disposition would have been

27  provoked and how such a person would react in the same situation knowing the same

28  facts."  Answer, Ex. 1 (Clerk's Transcript) ("CT") at 296; RT 1054-55.  This instruction was

United States District Court
For the Northern District of California

1  taken directly from the then-current standard instruction on "Attempted Voluntary

2  Manslaughter Heat of Passion - Lesser Included Offense."  CALCRIM No. 603 (2009 ed.).

3  Petitioner argues that this instruction on the sufficiency of provocation incorrectly directs the

4  jury to consider whether an average person would have acted in the same way as

5  petitioner did in response to the provocation, rather than to consider whether an average

6  person would have reacted from passion rather than judgment.

7      The due process right to a fair trial includes the opportunity to present a complete

8  defense.  *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Trombetta*,

9  467 U.S. 479, 485 (1984)).  Further, under the Due Process Clause, a defendant is entitled

10  to "an instruction as to any recognized defense for which there exists evidence sufficient for

11  a reasonable jury to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988).

12  *See also Bradley v. Duncan*, 315 F.3d 1091, 1098–99 (9th Cir. 2002).  This is so because

13  "the right to present a defense would be empty if it did not entail the further right to an

14  instruction that allowed the jury to consider the defense."  *Bradley*, 315 F.3d at 1099

15  (citation and internal quotation marks omitted).

16      When malice is an element of murder and heat of passion or sudden provocation is

17  put in issue in a homicide case, due process requires the prosecution to prove its absence

18  beyond a reasonable doubt.  *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975).  In California,

19  when a defendant puts provocation in issue by some showing that is sufficient to raise a

20  reasonable doubt whether a murder was committed, it is incumbent on the prosecution to

21  prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking.

22  *People v. Thomas*, 218 Cal. App. 4th 630, 643 (2013), *as modified on denial of reh'g* (Aug.

23  22, 2013) (citations omitted), *review denied* (Oct. 30, 2013).

24      Under California law, an intentional, unlawful homicide is voluntary manslaughter if

25  done upon "sudden quarrel or heat of passion."  Cal. Penal Code § 192.  "Sudden quarrel

26  or heat of passion" occurs "if the killer's reason was actually obscured as the result of a

27  strong passion aroused by a 'provocation' sufficient to cause an 'ordinary person of

28  average disposition to act rashly or without due deliberation and reflection, and from this

United States District Court
For the Northern District of California

1   passion rather than from judgment.  No specific type of provocation is required[.]

2   Moreover, the passion aroused need not be anger or rage, but can be any 'violent, intense,

3   high-wrought or enthusiastic emotion' other than revenge.  'However, if sufficient time has

4   elapsed between the provocation and the fatal blow for passion to subside and reason to

5   return, the killing is not voluntary manslaughter.'"  *People v. Breverman*, 19 Cal. 4th. 142,

6   163 (1998) (citations and internal marks omitted).  "The claim of provocation cannot be

7   based on events for which the defendant is culpably responsible."  *People v. Oropeza*, 151

8   Cal. App. 4th 73, 83 (2007) (citing *People v. Johnston*, 113 Cal. App. 4th 1299, 1312-13

9   (2003); *People v. Hoover*, 107 Cal. App. 635 (1930)).

10         "The heat of passion requirement for manslaughter has both an objective and a

11   subjective component.  The defendant must actually, subjectively, kill under the heat of

12   passion.  But the circumstances giving rise to the heat of passion are also viewed

13   objectively," such that "'this heat of passion must be such a passion as would naturally be

14   aroused in the mind of an ordinarily reasonable person under the given facts and

15   circumstances.'"  *People v. Steele*, 27 Cal. 4th 1230, 1252 (2002) (citations omitted).

16         Under California law, "The focus is on the provocation - the surrounding

17   circumstances - and whether it was sufficient to cause a reasonable person to act rashly.

18   How the killer responded to the provocation and the reasonableness of the response is not

19   relevant to sudden quarrel or heat of passion."  *People v. Najera*, 138 Cal. App. 4th 212,

20   223 (2006).  Thus, the jury should not determine whether a reasonable person would have

21   done what the defendant did, but rather whether a reasonable person would have acted

22   rashly under the same circumstances.  Petitioner argues, however, that the instruction on

23   provocation to consider "**how** such a person would react in the same situation" would allow

24   jurors to consider whether an average person would be provoked to kill, or attempt to kill,

25   as petitioner did.

26         To support his argument that the instructional language reflected an incorrect

27   standard for provocation, petitioner points out that after his conviction, the challenged

28   language from the Judicial Council's model instruction was stricken from CALCRIM No. 603

United States District Court

For the Northern District of California

1   in an April 2011 revision, and replaced with, "In deciding whether the provocation was

2   sufficient, consider whether a person of average disposition, in the same situation and

3   knowing the same facts, would have reacted from passion rather than judgment."

4   CALCRIM No. 603 (2011 ed.).  Similarly, the standard instruction on voluntary

5   manslaughter, CALCRIM No. 570, was revised earlier in December 2008, and instructs the

6   jury to consider, in deciding the sufficiency of the provocation, "whether a person of

7   average disposition, in the same situation and knowing the same facts, would have reacted

8   from passion rather than judgment.  CALCRIM No. 570 (2009 ed.).  Petitioner contends

9   that this revised language properly puts the focus of the provocation inquiry on the heat of

10  passion and not the action the person took after being provoked.

11      In its decision affirming the conviction, the court of appeal acknowledged that the

12  language of the CALCRIM No. 570 revision "may be better" than the wording used at trial,

13  "in the sense that it reminds jurors that they are deciding whether a person of average

14  disposition would have reacted from passion rather than judgment[.]"  Slip op. at 12.  The

15  state court determined, however, that the attempted voluntary manslaughter instruction

16  given in petitioner's case was not incorrect or misleading because in the context of the

17  instructions as a whole, the instruction makes clear "that the jurors must decide with regard

18  to the sufficiency of the provocation whether the evidence is sufficient to prove that 'the

19  provocation "would have caused a person of average disposition to act rashly and without

20  due deliberation; that is, from passion rather than judgment . . . ."  Slip op. at 13.

21      The court of appeal further noted that the jury was unlikely to misunderstand this

22  concept despite the challenged language because the trial judge instructed the jury to

23  "[p]ay careful attention to all of these instructions and consider them together."  *Id.*  The

24  state court found, "Nothing in the instruction suggests that the heat of passion form of

25  voluntary manslaughter is limited to the circumstances where a reasonable person 'would

26  react in a violent manner and attempt to kill' as claimed by defendant."  *Id.*  In rejecting the

27  challenge to the instruction, the state court concluded, "It is not reasonably likely that the

28  jury in this case misunderstood or misapplied the challenged instruction to mean that the

United States District Court

For the Northern District of California

heat of passion form of attempted voluntary manslaughter required that 'a person of average disposition' or a normal or reasonable person would have been so provoked as to kill or act violently."  Slip op. at 14.

The challenged instruction is not erroneous on its face.  Nowhere did the challenged standard instruction direct the jury to consider whether an average person would have reacted in the way that defendant did, or whether an average person would have been provoked to attempt to kill.  The state court acknowledged, however, that the challenged instruction on attempted voluntary manslaughter in the former version of CALCRIM No. 603 may have been ambiguous, in light of the "better" language in the revised instruction on voluntary manslaughter, which has since been added to CALCRIM No. 603.  Furthermore, other courts have found the challenged language of the former standard instruction to be ambiguous.  In *Thompson v. Harrington,* C 10-3263 EMC, 2011 WL 6936184 (N.D. Cal. Dec. 30, 2011), the court considered similar language used in the former version of the standard instruction on voluntary manslaughter, CALCRIM No. 570, which directed jurors to consider (1) whether a person of average disposition would have been provoked, and (2) **how** such a person would react in the same situation knowing the same facts.  On federal habeas review, the court in *Thompson* noted that the state court found instructional error under California law, which provides that, in the context of voluntary manslaughter, provocation is sufficient if it would cause an ordinarily reasonable person to act from passion rather than judgment, and does not require that the provocation must reasonably trigger a certain heightened level of reactive conduct.  2011 WL 6936184 at *7 (quoting *People v. Thompson,* No. H032991, 2009 WL 3809657 (Cal. Ct. App. Nov. 16, 2009)) (internal citations omitted).  "It need not further cause a particular *level* of conduct, let alone cause a reasonable person to react with lethal violence."  *Id. See Najera*, 138 Cal. App. 4th at 223.  Because the challenged instruction permitted a jury to consider the level of the response to the provocation, the state court of appeal, cited in *Thompson*, ruled that the former version of the standard instruction regarding provocation was ambiguous:

> Directing jurors to consider how an average person would react is not *necessarily* incorrect or inconsistent with the correct standard. However, the instruction does not expressly limit the jurors' focus to whether an average person would act rashly. Instead, the challenged language seems to invite jurors to consider what would and would not be a reasonable response to the provocation. More specifically, it allows, and perhaps even encourages, jurors to consider whether the provocation would cause an average person to do *what the defendant did*; i.e., commit a homicide. However, as we explained above, whether an average person would be provoked to kill is not a proper consideration in determining whether provocation was sufficient. Thus, insofar as the instructional language permits the jury to decide a crucial issue based on proper and improper considerations, it is ambiguous.

*Thompson*, 2011 WL 6936184 at *9 (quoting *People v. Thompson,* 2009 WL 3809657 at *8). Despite the instructional error and the prosecutor's misstatements regarding provocation, the court in *Thompson* denied federal habeas relief, finding that the petitioner failed to show that the errors at issue were prejudicial. *Id.* at *11. *See also Wells v. Swarthout*, No. C 11-3294 LHK, 2012 WL 5389744 (N.D. Cal. Nov. 2, 2012) (denying habeas relief where the state court reasonably concluded that the challenged voluntary manslaughter instruction, CALCRIM No. 570, may have been "ambiguous" because it invited jurors to consider "whether the provocation would cause an average person to do what the defendant did," and that any error was harmless).

Assuming that the challenged language, which instructed the jury to consider "how" an average person would react in the same situation, was ambiguous as to the standard of provocation, petitioner must show a "reasonable likelihood" that the jury misunderstood and misapplied the instruction in a way that violates that Constitution. *Estelle*, 502 U.S. at 72 and n.4. Because of the potential ambiguity of the challenged instruction, the court proceeds to consider whether the prosecutor's statements and other surrounding circumstances made it reasonably likely that the jury was misled to believe attempted voluntary manslaughter required that petitioner's response to the provocation must have been reasonable.

18

United States District Court

For the Northern District of California

1

**2.     Reasonable Likelihood**

Petitioner contends that even if the challenged instruction, standing alone, was not so ambiguous as to establish a reasonable likelihood that the jury applied the instruction in a way that violated the Constitution, the prosecutor's misstatements of the provocation requirement added to the confusion and the likelihood that the jury based its verdict on the misguided belief that voluntary manslaughter required that the provocation would have caused an average person to act like petitioner and attempt to kill.

Petitioner challenges the prosecutor's repeated suggestions to the jury in closing arguments that provocation would require a reasonable person to respond by being "so enraged that he would kill somebody," or pulling out a gun, as petitioner did.  Traverse at 15-17.  Specifically, petitioner challenges the following italicized statements:

- "One of the requirements of that is that there has to be adequate provocation.  You know, someone spits on you, you may not like it *but it's not enough to kill him for it.  It's not enough to push you to that point where you completely lose it.*" RT 971.

- "It requires a couple of things.  It requires, one, that you acted under this emotional effect that *made you lose reason and fly into a rage, a heat of passion.*" RT 972.

- "And if he gets a chance to cool off after he gets knocked down, . . . and it's like, okay, I'm no longer angry and in this rage, then it doesn't apply.  It's called the cooling off period.  *And if a normal person knocked down like this wouldn't get so worked up, just from one punch, if a normal person wouldn't, from one punch, get so enraged that he would kill somebody, well then it doesn't count.*" RT 973.

- "*The normal person getting punched like that wouldn't pull out a gun* when they're not even being threatened." RT 973-74.

- "Voluntary manslaughter doesn't apply unless you are provoked in such a way that you lose [ ] your sense of emotions.  You get into such a sudden

1    quarrel or heat of passion because of the provocation.  So he's got to be

2    provoked into becoming that state, but also . . . *a normal person would be*

3    *provoked into violence under the same circumstances.* . . . We're saying just

4    a normal, every day citizen, who got punched like that, would fly into a rage or

5    fly into whatever heightened emotional state.  That's where it fails. . . . *I'd say*

6    *it was more of a cold-blooded thing*.  He didn't shoot from where he was.  He

7    didn't shoot from the ground.  He didn't do that.  He got up and walked over to

8    wherever the fight was going on.  They knocked the guy – Tony Trujillo to the

9    ground.  That's when he pulled out his gun, that's when he stood over him,

10   and that's when he shot the guy on the ground. *That's not the act of someone*

11   *who's lost all sensibility because they're in some kind of emotional rage.  No,*

12   *that's cold-blooded execution*.  RT 1022.

13   Petitioner contends that these highlighted comments by the prosecutor were misstatements

14   of the law regarding the standard of provocation for attempted voluntary manslaughter, and

15   that the state court unreasonably applied clearly established federal law pursuant to

16   § 2254(d)(1).  Petitioner also contends that the state court failed to consider all of these

17   comments in its discussion of whether the jury was reasonably likely to misapply CALCRIM

18   No. 603 to require that an average person would be so provoked as to act violently or

19   attempt to kill, and that the state court decision was based on an unreasonable

20   determination of the facts, warranting habeas relief under  § 2254(d)(2).

21        The court of appeal addressed petitioner's argument that the prosecutor misstated

22   the legal standard of provocation during closing argument.  The court of appeal considered

23   whether the prosecutor's argument would have led the jury to misunderstand the legal

24   standard for provocation sufficient to support voluntary manslaughter, in the context of

25   petitioner's claim that the instruction was ambiguous and that it was reasonably likely that

26   the jury applied the wrong standard for provocation because of the prosecutor's

27   misstatements.  Slip op. at 13-14.  The state court summarized the "number of remarks

28   made by the prosecutor during argument" as stating that "a normal person would not be

United States District Court
For the Northern District of California

1    provoked into killing or acting violently if punched" and referred to the prosecutor's

2    statement "indicating attempted voluntary manslaughter requires that 'a normal person

3    would be provoked into violence under the same circumstances.'" Slip op. at 13.  The court

4    of appeal also cited the prosecutor's statement that provocation would require that an

5    average person "who got punched like that, would fly into a rage or fly into whatever

6    heightened emotional state." Slip op. at 13.

7         Although the court of appeal did not expressly rule on whether these remarks

8    misstated the law, the court cited *Najera* for the holding that the prosecutor there "had

9    misstated the legal standard of provocation by arguing that the law required a reasonable

10   person to have killed under the circumstances." Slip op. at 13.  The court of appeal did not

11   distinguish the prosecutor's statements in petitioner's case from the holding of *Najera*,

12   thereby implicitly acknowledging that the prosecutor misstated the law by suggesting that

13   heat of passion required that an average person would be provoked to attempt to kill.

14   Nevertheless, the court of appeal held that it was not reasonably likely that the jury

15   misapplied the challenged instruction.  The court of appeal noted that defense counsel, in

16   closing argument, read portions of the attempted voluntary manslaughter instruction after

17   emphasizing that the prosecutor's "ad-libbing of the law in that regard requires me to do

18   this because it's wrong and confusing." Slip op. at 14.  Because the jury was instructed to

19   follow the court's instructions if the attorneys' comments on the law conflicted with the

20   instructions, the court of appeal found no reasonable likelihood that the jury misapplied the

21   challenged instruction, "[e]ven if some of the prosecutor's comments in this case

22   misapplied or misstated the legal standard." Slip op. at 14.[1]

23   _____

24        [1]      Addressing a separate prosecutorial misconduct claim, the court of appeal held
     that the due process challenge to the prosecutor's alleged misstatements regarding the
25   standard of provocation was not preserved for appeal because defense counsel did not object
     to the argument, finding no basis for an exception to waiver of the issue.  Slip op. at 14-15.
26   The court of appeal further held that petitioner had waived his prosecutorial misconduct claim
     challenging the prosecutor's statements that petitioner did not act in the heat of passion if he
27   attacked first.   The court of appeal nevertheless determined that the prosecutor's remarks
     regarding the initiation of the provocation were not misstatements of law.  Citing state law
28   authorities holding that "the victim must taunt the defendant or otherwise initiate the
     provocation," and that a killer who provokes a fight cannot assert provocation by the victim, the

21

United States District Court

For the Northern District of California

1    Petitioner argues three grounds for establishing a reasonable likelihood that the jury

2    misapplied the instruction on the lesser included offense of attempted voluntary

3    manslaughter, in a way that relieved the state of its burden to prove every element of

4    attempted murder.  First, petitioner contends that the evidence supporting premeditation,

5    deliberation and malice was thin, which suggests that the jury incorrectly understood the

6    instruction for attempted voluntary manslaughter.  Traverse at 21.  The evidence at trial,

7    however, showed that petitioner exchanged words with the victim, which the victim

8    understood to be a confrontational gang-related reference.  RT 317-18.  The evidence also

9    showed that after the victim exchanged blows with both petitioner and his friend, petitioner

10   knocked down the victim, pulled out a gun while the victim was on the ground, and shot him

11   three times at close range before running off and leaving the victim for dead.  RT 321-33,

12   417-20.  This evidence supports the jury's finding of an intent to kill, not because of a

13   sudden quarrel or in the heat of passion, in entering an attempted murder verdict, and does

14   not give rise to an inference that the jury misunderstood the instruction on the lesser-

15   included offense.

16       Second, petitioner argues that the prosecutor argued forcefully that a verdict of

17   attempted voluntary manslaughter was akin to "basically feeling sorry for the guy whose

18   circumstances overcame him," and argued, incorrectly, that the jury would have to find that

19   a normal person would have reacted the same way, by pulling out a gun and shooting the

20   victim.  Traverse at 21.  To the extent that the prosecutor improperly suggested that

21   attempted voluntary manslaughter was tantamount to feeling sorry for the defendant who

22   was overcome by the heat of passion, giving the example of a man who finds his wife in

23   bed with his brother, RT 971, the court gave curative instructions not to let "bias, sympathy,

24   prejudice, or public opinion influence your decision," and that "[n]othing the attorneys say is

25

26   court of appeal held that under the circumstances of this case, "the prosecutor could properly
27   argue there was no legally sufficient provocation by victim Trujillo since there was evidence
     that defendant had started the fight."  Slip op. at 15-17 (citing *Barton*, *Oropeza*, and *Johnston*,
28   *supra*).  Petitioner does not seek habeas review of the prosecutor's remarks about provoking
     the fight.  Traverse at 24 n.5.

United States District Court
For the Northern District of California

1    evidence." RT 1037, 1040. When a curative instruction is issued, a court presumes that

2    the jury has disregarded inadmissible evidence and that no due process violation occurred.

3    *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden v. Wainwright*, 477 U.S. 168,

4    182 (1986); *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) ("we presume

5    jurors follow the court's instructions absent extraordinary situations").

6            Furthermore, the prosecutor's statements regarding "cold-blooded execution" were

7    not referring to his restatement of the standard of provocation, as petitioner suggests. RT

8    1022. Although the state court did not address this particular line of remarks, § 2254(d)

9    requires deference to the state court's adjudication of petitioner's claim. *James v. Ryan*,

10   733 F.3d 911, 915 (9th Cir. 2013) ("'when a state court rejects a federal claim without

11   expressly addressing that claim,' there is . . . a rebuttable presumption 'that the federal

12   claim was adjudicated on the merits'") (quoting *Johnson v. Williams*, 133 S. Ct. 1088, 1096

13   (2013)). When the "cold-blooded" remarks are read in the context of rebuttal argument, the

14   record reflects that the prosecutor was rebutting defense counsel's contention that

15   petitioner was acting in the heat of passion and "did not have the intent to kill Anthony

16   Trujillo when he awoke out of his loss of consciousness, stood up, and fired something

17   three times." RT 997. *See Darden*, 477 U.S. at 179 ("The prosecutors' comments must be

18   evaluated in light of the defense argument that preceded it."). Under California law, the

19   prosecutor bore the burden to prove absence of provocation to support a conviction for

20   attempted murder, and he argued that the attempt on Trujillo's life "was more of a cold-

21   blooded thing," rather than an act of "heightened emotional state." RT 1022. When read in

22   light of the whole record, the prosecutor's arguments do not create a reasonable likelihood

23   that the jury applied the heat of passion instruction in a way that was unconstitutional. In

24   light of the evidence presented in the state court proceeding, the state court's factual

25   determinations concerning the prosecutor's statements were not objectively unreasonable

26   pursuant to § 2254(d)(2).

27           Third, petitioner argues that the Judicial Council modified CALCRIM No. 603 based

28   on a recommendation that the challenged language that was used at petitioner's trial,

United States District Court

For the Northern District of California

1   referring to "how" an average person would react in the same situation, raised a concern

2   that jurors would be confused about the state of mind required for voluntary manslaughter.

3   Traverse at 21-22.  The eventual clarification of the standard instruction for attempted

4   voluntary manslaughter suggests that the prior version was ambiguous, but does not

5   demonstrate that it was reasonably likely that the jury would have applied the challenged

6   instruction to require that an average person would have been provoked to kill, rather than

7   whether the provocation would have caused an average person to act rashly and without

8   due deliberation, "that is, from passion rather than from judgment."  RT 1054.

9        In the context of the instructions as a whole and the trial record, the state court did

10  not unreasonably conclude that it was not reasonably likely that the jury misunderstood or

11  misapplied the attempted voluntary manslaughter instruction.  The court specifically

12  instructed the jury that "[h]eat of passion does not require anger, rage, or any specific

13  emotion.  It can be any violent or intense emotion that causes a person to act without due

14  deliberation and reflection."  RT 1054.  The court also instructed the jury that "[y]ou must

15  follow the law as I explain it to you, even if you disagree with it.  If you believe the attorneys'

16  comments on the law conflict with my instructions, you must follow my instructions."  As the

17  record reflects that the trial court explicitly instructed the jury that rage or anger was not

18  required, and told the jury to disregard the prosecutor's statements if they conflicted with

19  the court's instructions, it is not reasonably likely that the jury misapplied the ambiguous

20  instruction, despite the prosecutor's misleading comments.  *See Boyde v. California*, 494

21  U.S. 370 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do

22  instructions from a court.").

23       Furthermore, the record shows that defense counsel, in closing arguments, attacked

24  the prosecutor's statements as "wrong and confusing," and focused on the instructions

25  requiring provocation to cause an average person to react "from passion rather than from

26  judgment," thus decreasing the possibility the jury misunderstood the law.  Defense counsel

27  explicitly read the language instructing the jury on the elements of sudden quarrel or heat of

28  passion, including whether "the provocation, whether it be sudden quarrel or heat of

United States District Court

For the Northern District of California

passion, would have caused a person of average disposition to act rashly and without due deliberation.  That is, from passion rather than judgment."  RT 999.  At the close of argument, the court read this particular instruction on heat of passion or sudden quarrel, directing the jury to consider whether the provocation would have caused an average person "to act rashly and without due deliberation" and whether the attempted killing "was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment."  RT 1054.

Although petitioner has not shown a reasonable likelihood that the jury applied the challenged instruction in a way that denied him an opportunity to present a complete defense or that relieved the state of its burden of proof, this case presents a close question because the prosecutor made several erroneous remarks suggesting that the jury should consider how a reasonable person would have reacted in response to the same provocation, i.e., being punched in the face.  *See Najera*, 138 Cal. App. 4th at 223 ("How the killer responded to the provocation and the reasonableness of the response is not relevant.").  Respondent concedes the "possibility" that the jurors could have misinterpreted the instruction on finding provocation, Opp. at 13.  Proceeding on the assumption that the challenged instruction was ambiguous and that there is a reasonable likelihood that the jury misapplied the instruction, the court considers whether the instructional error was prejudicial.

### 3.    Prejudice

Petitioner contends that the instructional error, in combination with the prosecutor's misstatements of the law, had a substantial and injurious effect on the outcome of the trial by allowing the jury to base its verdict on the mistaken belief that attempted voluntary manslaughter required that an average person would have been provoked to attempt to kill, as petitioner did, rather than requiring only that the provocation would cause an average person to act rashly.  Traverse at 23-24.  Because the state court held that it was not reasonably likely that the jury misapplied the challenged instruction, it did not reach the question whether the instructional error was prejudicial.  The court therefore considers the

United States District Court

For the Northern District of California

1    issue of prejudice de novo. *Amado v. Gonzalez*, 734 F.3d 936, 948 (9th Cir. 2013) ("Where

2    a state court addresses only one element of a claim, federal courts reviewing a habeas

3    petition on that claim apply a de novo standard of review to the elements of a claim that the

4    state court did not discuss.") (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)), *pet. for*

5    *reh'g and reh'g en banc filed* Dec. 13, 2013.

6          Petitioner does not dispute that he shot Anthony Trujillo three times from close

7    range.  The sole issue at trial was petitioner's mental state at the time of the shooting, i.e.,

8    the presence or absence of malice required for attempted murder.  Traverse at 13.

9    Petitioner contends that his sole theory of defense was that the shooting occurred in the

10   heat of passion and/or because of a sudden quarrel with the victim, and that the evidence

11   was presented to support his provocation theory.  Further, to prove attempted murder, the

12   prosecution was required to prove the absence of heat of passion.  Thus, the jury was

13   instructed with the lesser included offense of attempted voluntary manslaughter which

14   included the standard for provocation.

15         As discussed above, petitioner challenges only the portion of the voluntary

16   manslaughter jury instruction specifying that "[i]n deciding whether the provocation was

17   sufficient, consider whether a person of average disposition would have been provoked and

18   how such a person would react in the same situation, knowing the same facts."  Petitioner

19   contends that the ambiguous instruction, coupled with the prosecutor's arguments

20   misstating the provocation requirement, restricted the jury's consideration of attempted

21   voluntary manslaughter and so infected the entire trial that the resulting conviction violated

22   due process.  To establish prejudice, petitioner argues that the instructional error went to

23   his sole defense of provocation, and had a substantial influence in determining the jury's

24   verdict of attempted murder.

25         In weighing the prejudicial effect of these errors, prosecutor's arguments at closing

26   "generally carry less weight with a jury than do instructions from the court" and "are not to

27   be judged as having the same force as an instruction from the court."  *Boyde*, 494 U.S. at

28   384-85.  In this case, the instructional error directing the jury to consider "how" an average

**United States District Court**
For the Northern District of California

1  person would react, when considered in the context of the entire instruction setting forth the

2  elements for sudden quarrel or heat of passion and clarifying that heat of passion "does not

3  require anger, rage, or **any specific emotion** [but] can be **any violent or intense emotion**

4  **that causes a person to act without due deliberation and reflection**," did not have a

5  substantial or injurious effect in determining the jury's verdict, particularly in light of the

6  strong evidence that petitioner did not act in the heat of passion but acted intentionally in

7  shooting the victim.

8       To show that he shot Trujillo in the heat of passion, petitioner points to the evidence

9  summarized by the court of appeal, including his own statements about the shooting, that

10  supported his defense: Trujillo punched petitioner in the face, causing petitioner to lose his

11  balance and fall back; petitioner repeatedly told the detective that when he woke up, he just

12  "let it go" or "let it loose;" he did not know if the shooting happened because he was

13  knocked out and did not know what was going on; he said, "I don't know if there was my

14  emotions, my actions, or imagine of me to be knocked out, and not getting up, and not

15  knowing."  Traverse at 26-27 (quoting slip op. at 5-6).

16       Petitioner's self-serving statements are outweighed by the evidence of intent to kill

17  and absence of sudden quarrel or heat of passion: petitioner and his friend initiated a

18  confrontation with Trujillo outside the trailer home; petitioner taunted Trujillo with gang

19  terms, referring derisively to Soledad, where Trujillo said he was from; petitioner shoved

20  Trujillo, who then punched petitioner in the face, causing him to fall back; after Trujillo

21  exchanged punches with petitioner's friend and pushed him out of the way, petitioner

22  rushed at Trujillo and knocked him over; petitioner then pulled out his gun and shot Trujillo

23  three times as Trujillo was trying to get up; petitioner and his friend then ran off while

24  Trujillo lay on the ground with life-threatening gun shot wounds.

25       The prosecutor also presented the testimony of a criminalist who opined that the two

26  unexpended cartridges that were found at the crime scene appeared to be from the same

27  manufacturer as the three spent shell casings.  RT 636.  The unexpended cartridges could

28  have come out of petitioner's gun, without being fired, by manually pulling back the slide on

**United States District Court**
For the Northern District of California

1  the firearm to eject the loaded cartridge, although no forensics analysis had been done to

2  determine whether the cartridges were ejected from a weapon or simply dropped out of

3  someone's pocket.  RT 639, 652.  The gun operator might eject a live round if he did not

4  remember whether a bullet was in the chamber before firing, and would pull back the slide

5  to pick up a cartridge from the magazine and eject the bullet that was already in the

6  chamber; or, if the gun malfunctioned and a cartridge was jammed, the operator would

7  manually pull the slide back to try to eject the malfunctioning cartridge.  RT 641.  Only one

8  round in the chamber would pop out at a time, so it was likely that the person operating the

9  gun would have pulled back the slide at least twice to eject the two unexpended cartridges.

10  RT 640.  In light of this strong evidence that petitioner knocked over the victim before

11  pulling out his gun, shooting the victim on the ground three times at point-blank range, and

12  twice pulling back the slide, weighed against the relatively weak evidence to support his

13  theory of sudden quarrel or heat of passion, petitioner fails to show that the prosecutor's

14  misstatements and the instructional errors were prejudicial.

15       In light of the record of the state court proceedings, the state court's conclusion that

16  the instruction on attempted voluntary manslaughter did not violate due process was

17  neither contrary to, nor an unreasonable application of, clearly established federal law.

18  Habeas relief is therefore not warranted.

19                               **CONCLUSION**

20       For the reasons set forth above, the petition for a writ of habeas corpus is DENIED.

21  This order fully adjudicates the petition and terminates all pending motions.  The clerk shall

22  close the file.

23                          **CERTIFICATE OF APPEALABILITY**

24       To obtain a certificate of appealability, petitioner must make "a substantial showing

25  of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has

26  rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

27  straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

28

United States District Court

For the Northern District of California

1  district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

2  *McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a

3  COA to indicate which issues satisfy the COA standard. Here, the court finds that the issue

4  presented in the petition meets that standard: whether petitioner's due process rights were

5  violated by an erroneous jury instruction on attempted voluntary manslaughter, coupled

6  with the prosecutor's misstatements about the provocation requirement. Accordingly, the

7  court GRANTS the COA as to that issue. *See generally Miller-El*, 537 U.S. at 322.

8  　　　The clerk shall forward the file, including a copy of this order, to the Court of

9  Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir.

10  1997).

11  　　**IT IS SO ORDERED.**

12

13  Dated: March 31, 2014　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

14  　　　　　　　　　　　　　　　　PHYLLIS J. HAMILTON
　　　　　　　　　　　　　　　　United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28